So our first case is Road-Con v. City of Philadelphia 23-1782. Mr. Mitchell, how are you, sir? Welcome to Philadelphia. Thank you, Your Honors. May it please the Court. Plaintiffs in this case are challenging two components of the City of Philadelphia's Project Labor Agreement with the Philadelphia Building and Construction Trades Council. First, the plaintiffs are challenging the legality of the Union Security Clause, which requires all employees of city contractors to join and pay a council-affiliated union as a condition of working on any city construction project covered. They've backed off that provision. They haven't initiated a subsequent executive order in that provision. That requirement no longer exists. What, if anything, should we think of that? You are correct, Your Honor. The executive order issued in 2020 purports to rescind that provision after we file suit, but that does not moot our claim for several reasons. First, let me ask you, you said purports. I mean, it does or it doesn't? Well, it says it rescinds it, so now... On its face? That's what the executive order says. Now, to the extent of how that order will be enforced, we don't know yet, but they did... Can I ask him about that? Sure, but... And if they say it's not going to be enforced, would that eliminate a standing issue? No, it would not, for several reasons. Standing is assessed on the world that existed at the moment we filed our complaint. Any subsequent post-filing events would go to mootness, not the issue of standing. And it would not moot our claims either, because we are seeking money damages in addition to prospective relief. So there's nothing the new executive order can do in any way that would make our claims for damages become moot. And the second reason it shouldn't moot our claims is because voluntary cessation is typically not going to be something that can moot the case when the defendant changes its behavior voluntarily in response to a lawsuit. Are you talking about prospective damages? No, there's no such thing as prospective damages. So what damages are we talking about? We're seeking damages for the past enforcement of the project labor agreements that prevented our clients from obtaining work on any city construction project covered by the PLA, because they are affiliated with the United Steelworkers rather than a union affiliated with the Philadelphia Building Constructions Trade Council. So there's past injury that happened before we filed their lawsuit. There's also prospective future injury that will be incurred if this court does not enjoin the union security clause going forward. But future injury, isn't that resolved by the new executive order? Well, future injury, no, because voluntary cessation does not normally moot a claim for prospective relief. If they were to say that they have no intent of ever enforcing such a provision in the future, as a judicial admission, if I were asking that question, wouldn't that get around that problem? But still, Judge McKee, the question to ask for state purposes and standing is different. For mootness. For mootness, okay. So there would still be standing. On mootness, the question would be, is the city's act of voluntary cessation a permissible means of mooting this case? And the normal answer to that question is no. Now, the city comes back and says, there's a presumption of good faith that should attach to decisions made by government entities. That's their argument for mootness with respect to our claims for prospective relief. I've never found the trust us argument very persuasive. You don't find the trust us argument persuasive? Trust us, the good faith argument, I'm aware the agency, the government, there's a presumption of the government acting in good faith. Basically, it's trust us. That's what I'm saying. Yeah, and I think what they're trying to argue is there are some cases suggesting that when a government entity changes its policy in response to a lawsuit, that they get a little more deference than a private litigant would get if he tries to duck a lawsuit by changing his behavior in response to a lawsuit brought by a plaintiff. And there are some cases suggesting that. But the difference here is, number one, this was an executive order done unilaterally by the mayor. And this was pursuant to a change in the law and that the executive order was simply a recognition of the change in the law. Well, the executive order is something that was done unilaterally by the mayor, but the mayor can reinstate the union security clause at any time. If this court were to dismiss our claims to a prospective relief as moved, a future mayor can still go back and reimpose the union security clause. There is nothing in the law that would prevent a mayor from doing this. This is not like a change in a judicial admission today that they have no intention and will if they make a statement today that they will. No, they have not made any such commitment yet. But if they were to make that statement today, would that get around that problem? If it were legally binding as a commitment, it would certainly be a much stronger argument for moving this. Why wouldn't it be a judicial admission? I'm sorry, what do you mean? Why wouldn't it be a judicial admission if they were to make that statement today? We have no intention. Because it's not memorialized in any type of agreement that was signed off on by a judge. I don't think there's any way we could go and hold them in contempt of court if some future mayor were to change his mind. This current regime in the city represents the current administration. Future mayors can be elected that have different policy preferences, and they may decide to reinstate the union security clause. And there's nothing in the executive order that prevents a future mayor from doing that. Just as the current mayor may issue an executive order today that revokes the union security clause, another mayor in the future could issue a new executive order that reinstates it. So there is still a case for controversy between us and the defendants with respect to prospective future relief. Because even though they did change their behavior in response to a lawsuit, the burden on them is a heavy one. They need to show that it is absolutely clear that the challenged conduct cannot reasonably be expected to recur. And they can't make that showing all they did was change an executive order, which the new mayor can change or a future mayor can change with the stroke of an executive hat. This would be a different case, I think, if the state of Pennsylvania had passed a law banning particular agreement. So that would have been done by the state legislature. That would be binding on all components of state government, including cities. But this is just a unilateral policy change made by the mayor by himself. And a future mayor can go back to the old policy anytime. And if this court were to dismiss this case as moot, that option would remain open for the city of Philadelphia. So there is still a case for controversy between us and the city, notwithstanding this recent change of policy. You're not challenging PLAs, you're challenging the components of this particular PLA. That's correct. We're challenging the union security clause, and we are challenging the diversity and inclusion requirements. We're not challenging other parts of the PLAs. Understood. The problem is that Janice, and again, if we brought this lawsuit before Janice, I don't stand on, but when Janice held that the First Amendment prohibits public employers from requiring their employees to join or pay a union as a condition of state employment, that calls into question any type of union security clause in a city's project labor agreement with the union that is essentially saying to city contractors, if you want to work on our construction projects, you have to force every one of your employees to join and pay, not just pay, but join and pay these council-affiliated unions as a condition of continued employment. And again, the city's willingness to change their executive order in response to our lawsuit, to me, is at least some indication that even the defendants realize that the compulsory union membership regime in that union security clause is a problem, a major First Amendment problem under Janice. Now, of course, the district court didn't reach the merits because it threw us out on established injury in fact, with respect either to past injury or future injury. And that holding on Article 3 standing is wrong and should be reversed. Who was harmed here? LaCava? All of our plaintiffs. Isn't it a testimony that he had no intention of working in the city? Well, he has no ability to work on a city project covered by a CLA. He didn't testify in any way that he has no intention of working in the city. What our contractor plaintiffs have all said in declarations is that they have bid on projects offered by the City of Philadelphia in the past. They intend to do so in the future. And RoadCon itself specifically bid on two projects that were covered by project labor agreements, the 15th Street Bridge Project and the Roy Project. Only one plaintiff needs to have standing to seek prospective leave if we're all seeking the same remedy. And that's the case here. So if Mr. LaCava has standing, just RoadCon, or just the contractor plaintiff, or if only our employee plaintiff, Mr. LaCava, has standing, that's all we need. Well, LaCava has been consistently employed, I guess, for the past 20-some odd years at the city. I'm sorry, I didn't hear you. LaCava has been employed for the past 20-some odd years? Yes, that's correct. And he's a member of USW? Yes. And USW has the same D&I provisions. Basically, they say that they have no problem with the D&I provisions. What they said in their correspondence with the city is that they would try to comply with these diversity and inclusion goals. Now, negotiations— Actually, laud may be too strong of a word. But I thought they basically said that they had no problem, not just that they would try to comply. That's right. They had no problem. They had no philosophical or ideological objection. They had them themselves. I'm sorry. They had them themselves, USW. I don't think there's anything in the record saying that, that the union itself had diversity and inclusion goals. Because these goals are being imposed by the city as a condition on the contractors and also a condition on the unions that the employees of the contractors belong to. We don't have evidence in the record about a union itself, such as the United Steelworkers, imposing diversity and inclusion goals of its own accord. Now, the problem we had is the negotiations between the city and the United Steelworkers broke down. There was an effort made by the United Steelworkers for several years to try to get themselves added to the PLAs. We have all this correspondence in the record. We describe it in the brief. And they hit a snag over these diversity and inclusion goals. It's not totally clear from the record. But was the snag monitoring or the substance of the D&I goals? And if it was the monitoring, how does that impact your argument? So the city said to the United Steelworkers in their correspondence that they needed to sign off on these diversity and inclusion goals in order to be subject, in order to be covered essentially by the project labor agreement. And the United Steelworkers went back to the city and had some questions about the monitoring. The city never got back to the United Steelworkers about this. So the argument we're making before the court is that the diversity and inclusion goals were a but-for cause of the United Steelworkers' exclusion. Both their exclusion in the past and the continued exclusion. That's all we need to show under 1981. There's a but-for-cause relationship between the existence of these diversity and inclusion goals and the categorical exclusion of the United Steelworkers from the city's project labor agreement. We know exactly why these negotiations broke down. But what we do know is that if these diversity and inclusion goals had not existed, there would have been no impediment at all to the United Steelworkers being welcomed into the company of unions that are subject to the city's project labor agreement, where you can actually work on city construction projects while being a member of one of these city endorsed unions. And the Steelworkers have still not been added to that list. The diversity and inclusion goals have been the hang-up. It doesn't matter. There's no question that they're standing here because we understand that they were both able and willing to participate on these contracts if there wasn't the set-asides that were put in place by the city. And there's no question that the policy is at least arguably discriminatory on its face in terms of an equal protection case. Then what is the relevance of USW's non-presence here? It seems as though they could have brought their own suit, I suppose. But does it matter that they didn't? I don't think it matters at all. They could have if they wanted to sue over this. But they have chosen not to when we're suing instead on behalf of Steelworker-affiliated contractors and one member of the United Steelworkers who's been excluded from city projects. I'm not sure why the Steelworkers Union itself did not want to participate in the lawsuit. They're not our client. These are our clients that they wanted to bring suit because they've been for years just unable, categorically, to obtain work on any of these city projects covered by the PLA. And again, before Janus, we didn't really have the First Amendment issue that we're bringing right now. Diversity and inclusion goals are being challenged because that was the reason why the list of unions that the city is willing to approve as permissible unions for employees of city contractors. And that's clear as a matter of established fact, because we're on summary judgment. And I wasn't as certain as you seem to be anticipating as to what the reason was. Again, they're saying that it was because of the monitoring issue. You can say there's no difference because it was not the issue of monitoring, but the substance of what would be monitoring. So it's the same thing. But I'm just not sure it is. So in our view, Judge McKee, it doesn't matter whether the monitoring really was the hang up or unwillingness to comply with the diversity and inclusion goals was the hang up. Because in either situation, it is still the existence of the diversity and inclusion goals that caused the steelworkers to be excluded from the contract. And that's what's causing the injury to our clients. Our clients are being injured because the steelworkers aren't included in the PLA. And I see my time has expired. I'm happy to continue. Go ahead. Let me circle back to mootness. Please. In our La Spina opinion. I'm sure Mr. Gottlieb argued that La Spina controls here and this case is moot. Could you address that in anticipation of his argument? Yeah, the difference between this case and La Spina is that the unions and the public employers in La Spina changed their behavior in response to a Supreme Court ruling that declared unconstitutional what they were doing. So because there was a binding Supreme Court precedent on point, they were able to satisfy the very demanding showing that it was that there's no reasonable possibility that the challenge conduct can be expected to recur. The problem we have here is that the change in behavior made by the defendant was not done in response to a Supreme Court pronouncement that came out during the litigation. It was instead done in response to a unilateral decree by the mayor that can easily be undone by this mayor or a future mayor. And there's nothing that binds a future mayor to the current policy that the current mayor has endorsed in this extant executive order. So again, when you look to voluntary cessation, the test has to be if a defendant wants to argue for mootness, is it absolutely clear that the challenge conduct cannot reasonably be expected to recur? That's the test. The defendants in La Spina could satisfy that test because of Janus, that Supreme Court decision that came out. We don't have any such Supreme Court decision here. That's why this is a much harder case for the defendants on the mootness issue. Thanks. Thank you very much. Thank you, Your Honor. See you on rebuttal. Mr. Gottlieb, good morning. May it please the court. Craig Gottlieb representing the Appellee City of Philadelphia. Joining me at council table is Susan O representing the Appellee Interveners. I will be presenting argument on behalf of all appellees. Ms. O is available if the court has any intervener specific questions. I'd like to first address the First Amendment and then equal protection. On the First Amendment, the city will not enforce to answer, anticipate the question I was going to get. The city will not be enforcing the compelled, will not reenact or enforce any sort of compelled unionization clause. Mr. Mitchell's arguing that that's all fine and good. But what happens five years from now, a new mayor and this new mayor decides that they're going to do the same thing? Well, let's first take a step back that that we now this is the new mayor, right? Like this, the new mayor for four years, five years. Well, I understand that. But I'm establishing the pattern that it started with Mayor Kenney. And now under under Mayor Parker, it still won't be enforced. And although I can't, I obviously can't speak to the mind of what a future mayor will be. Isn't that the problem, counsel? I mean, I think their argument is, it's not as if you changed conduct in response to a Supreme Court decision. It's my understanding that it was more than two years after Janice that the EO was rescinded. And after the suit was filed, then at no point during that time, as the city said, we acknowledged some sort of binding declaration from the executive that this was inconsistent with the law and therefore unconstitutional. In other words, I appreciate your candor today. And I don't doubt I don't think any of us doubt your good faith. But the problem is voluntary secession doctrine hasn't been held to operate. It has to be absolutely certain. It's a formidable burden that you have to be absolutely clear that it's not reasonably certain to occur again. And what we look to is when did the city change its conduct? What was the impetus? And what we have here is 24 plus months of persistence after Janice and then pivoting only in response to the litigation. So how do you address that? I think the ultimate question, Your Honor, is will we revert? And we won't revert. And the only question is, can they be sure that? Or are you legally precluded from reversing? That's the problem. There may be a way to resolve that by a settlement or something as to certain issues or documents could be sent. But it seems to me that's not the problem. Not really, because you can't predict the future. You know what? You may not always be in the position that you're in now. Someone else could come in under the mirror, will come in at some point. And that's the problem. But in response to your question, Judge Luigi, and Judge Meade's question, we are responding to Janice. It just took a while. I mean, that is ultimately what happened. But this lawsuit caused us to study Janice and caused us, let's not forget Alan Myers as well, which brings us to the same result. Compelling unionization is extremely problematic. And we see that under Janice. And we see it under Alan Myers. And we're not going to do it. And also, Your Honor, we saw it wasn't that we stopped. We can't do it now after Janice and after Alan Myers. You can't do it now, can you? Agreed. Compelling unionization. Agreed. What about the DNI provisions? Those are unaffected by Janice and Alan Myers. We're only arguing for mootness, Your Honor, on the First Amendment, not on the Equal Protection Clause. So you're not pursuing a mootness argument on the Equal Protection Clause? Correct. Correct. Just on, but as you say, Judge McKee, we can't do it under Janice and Alan Myers. And that ends the mootness question. It's moot. I would like to follow up before moving on to equal protection that we have an entirely independent argument on First Amendment standing. And it's our view that First Amendment standing is controlled by Associated Builders. Associated Builders was essentially the same case and prevents any standing arguments by the plaintiffs. Now, we argue that Associated Builders is distinguishable, but it's not. And let me just walk through that briefly before I move on to equal protection. For Associated Builders, the question was an imminence question. And it was a question of, the issue is, would the plaintiffs bid on a PLA-covered contract? And it's important to distinguish two different things. The question is not, would they bid on a contract that is not governed by a PLA? It's, would they bid on a contract that is governed by the PLA? What about the futility problem? I'm sorry? What about the futility problem? Whatever futility problem exists was present in Associated Builders as well. They did not get a sorry call from Associated Builders. It was not an issue. There, the contractor simply had not bid. And they said they had no intent to ever bid and never were going to bid. Same here. I'm sorry? It was a fairly sweeping declaration of non-participation in the city contracts. Don't we, here we have represent, we have allegations of the complaint that says they would like to bid. They were going to bid. And in fact, they did. Worldcon did bid, right? Without a PLA. That's the key. They have to show that they were going to bid without a, I'm sorry. They have to show that they were going to bid with the PLA. This is a critical distinction. All they show is that they were going to bid without a PLA. We accept that. They were going to bid without a PLA. Worldcon did bid without a PLA. So we're not going to argue that they didn't satisfy that standard. But they have to show that they were going to bid with the PLA. That is what Associated Builders holds. And they never made that showing. They try to make that showing. They argue in their reply because they understand that that's the law. I don't think they're going to disagree. Didn't they allege they intended to bid on the 15th Street project on the runway project? They say, this is from their initial complaint. Worldcon and Loftus intend to submit a bid for the 15th Street project. That's the language that we're talking about. That language is ambiguous as to whether they intend to bid with or without a PLA. Which is the question. That doesn't answer the question. That's the judgment he's put on futility. Associated Builders, it was a complete lack of interest. They weren't bidding on anything. Here they're saying, no, we were going to bid. And we want to bid. But it's futile. And I don't think Associated Builders reaches as far as you're hoping it to. Because that would certainly change things. But I think Associated was very clear in saying, look, they're clear. They're candid. We're not bidding on any of these contracts. It doesn't matter. We're not interested in this work. Here you have plaintiffs. They're saying, no, we're very interested in this work. And we want to bid. Isn't that a difference from Associated? No, Your Honor. In Associated Builders, the contractors were very clear that. These are the same lawyers, so you can ask them. But the contractors were very clear that they would have bid without a PLA. So this concept that they weren't going to bid is not correct. They would have bid without a PLA. Their affidavits swore that they were going to bid without a PLA. They just said they could not bid with a PLA. It is exactly like this case. It is indistinguishable. It's the exact same facts. Both sets of contractors would have bid without a PLA. None of the contractors could show that they would bid with a PLA. So it is exactly Associated Builders. That is the question. So they have two independent problems on their First Amendment, the mootness and standing. In fact, Your Honor, I'm going to read to you if I can find it really quickly. I'm having trouble locating it, but it was an affidavit from the builder. Send us a 28-J submission on that. Let me give it time to pour this out without worrying about the sort of damocles called sweeping your head off. Okay. Okay. And just to be clear, I'll send a 28-J submission that makes it clear that the contractor in Associated Builders would have bid on a contract without a PLA, but can't and won't bid on a contract with a PLA, which is exactly the same situation here. But we have mootness. So they have two major hurdles to overcome on the First Amendment. Equal protection. The party has a lot of briefing and discussion of equal protection, but I wanted to highlight two facts up front that I think give the court a straight path to equal protection resolution. I'm going to read two sentences from the district court's opinion. I don't think plaintiffs dispute either of these sentences. The first sentence is, plaintiffs have not known their employees are majority male and white. That's on page A-7. And plaintiffs have not established that USW's union membership is majority white and male. That's on page A-26, footnote 58. It's my contention that those two sentences end equal protection analysis. There's nothing further to discuss once you accept those two sentences. There may... We think that Schedule C is completely defensible. And because the court asked about it before, I will discuss that if the court's interested. But it doesn't matter. Any analysis of Schedule C in this case is purely advisory. They didn't prove that either the union or the contractors were majority male and white. So they were unaffected by Schedule C. Given that they were unaffected by Schedule C, this is not the case to evaluate constitutionality of Schedule C. Do you agree that they have standing? I do not agree that they have standing. So I'd like to discuss each of the types of plaintiffs individually. I think the analysis differs depending on whether it's a contractor plaintiff or Mr. LaCava. Let me start with the contractor plaintiffs. The reason why the contractor plaintiffs do not have standing is because the goals in this case... And just let me take one step back. Judge Meaney, before you... I think you referred to Schedule C as set-asides. But we disagree with that. It's not set-asides. It's goals. So it's aspirational. Aspirational. Correct. And I'll come back to that in a second. But on the standing question, whether it's goals or preferences or set-asides, whatever you want to call it, the contractor plaintiffs do not have standing because these goals are focused on the employees. This is a different case than the Supreme Court's case on standing, like Croson or Adirond or Jacksonville. In all of those cases, the alleged discrimination was against the owner. The owner had to show that they had a certain percentage of minorities. Here, there's no discrimination against the owner. Any alleged discrimination... We don't think there is any. But any alleged discrimination is against the employees. Whose employees? The contractor's employees. Okay. At most. And I want to discuss each set individually, and you're going to ask me, what about La Cava? And I'm going to answer that. But right now, I'm just trying to get through the contractor plaintiffs. Contractor plaintiffs don't have standing because they're not suffering any potential discriminatory harm. Well, they're going to argue they can't get to work. They're not being considered. But unlike all of the other cases, it's not focused on them. It's focused on the employees. What about the city of Jacksonville? Does that undermine that argument? No. Why not? No, because Jacksonville was discrimination against the contractor. It was discrimination against the contractor because it looked to the percentages of the contractor to determine if they were... Percentages of ownership of the contractor to determine if the contractor was an MBA. So you had to look at the percentage of ownership of the contractor. So the contractor's race mattered in Jacksonville. It doesn't matter here. The contractor doesn't have a race in this case. There's... That's a false way of thinking about the nature of the contractors here because we're not asking to consider what are the percentage of the makeup of the contractors. We're only asking to consider the percentage of the makeup of the employees. That raises the question, well, perhaps the employees have standing. And perhaps in a theoretical sense, some employees would have standing. But not Mr. LaCava. Not Mr. LaCava. Why is that? Mr. LaCava doesn't have standing because as Judge McKee alluded to during Mr. Mitchell's argument, he didn't show an interest in this. He didn't say that he wouldn't work for the city. He just said he didn't care. It didn't matter to him. He'd work for the city. He'd work for somebody else. It didn't... He expressed no preference as to where he worked. The other reason that this... But that's, again, we're back to Associated Builders. Associated Builders was a flat declaration of... I am not taking this. You're pointing to, and I'll charitably agree with your characterization, benevolence, openness. That's not Associated Builders though, right? I mean, that would be a different holding. I agree that this... I'm not making an Associated Builders argument with respect to Mr. LaCava. I am making it on the First Amendment issue. I'm not making it with respect... I mean, I'm making it with respect to all plaintiffs on the First Amendment issue. I'm not making it with respect to Mr. LaCava on the equal protection issue. I do think he has a different problem, which is that he can't show any harm by these provisions. There are goals, and if the court permits me, I would like to speak to the significance of the fact that there are goals. But even apart from that, he was a foreman. He wasn't losing any work. He hadn't been employed for years straight without any city contracts. There was no evidence that he was going to be harmed by the Schedule C at all. Again, he had worked for five straight years without a break. He had been employed for half a decade without any issues, without Schedule C, so there's no reason to believe that Schedule C was going to harm him. So individually, neither Mr. LaCava nor the plaintiffs have... No, the contractor plaintiffs have standing. Briefly on goals, best efforts, it's our position that we're just asking people to try. All they have to do is try. If they don't succeed, there are no economic consequences. There's also... This is the wrong case to address the goals because plaintiffs never made any record as to what we're talking about, what it means for best efforts. This case is in some ways operating in a vacuum, and it would be a strange case for the court to decide that a request to take best efforts is unconstitutional because there was no... They're going to point to the mandatory language, shall, and things like that. Shall perform goals, shall do best efforts, not shall hire minorities. It's very different than Croson. It's very different than the other cases the plaintiffs cite. Should we remand this to the district court to address that issue in the first instance? You don't need to because of where I started on the equal protection point. These plaintiffs have nothing to do with Schedule C. Putting distance with Corson in your case, it seems to me Corson helps you to the extent that the 2009 commission is part of the record. I'm not sure it is part of the record, but if it is in the record, doesn't that help you vis-a-vis Corson? Yes. We believe that the commission report satisfies the commands of Corson, so yes. But the court doesn't... I mean, yes, you also don't need to reach that because these are the wrong plaintiffs and also because they don't have standing for the reasons that I explained, but also because of the nebulous nature of best efforts. I don't think a remand is necessary because on its face, all it just says is you have to try and there's nothing unconstitutional about that. So for these reasons, we ask the court to affirm. Thank you. Sorry. All right. Thank you, Your Honor. Standing. We addressed the Associated Builders case on the first four pages of our reply brief, and I also want to flag the affidavits that were submitted by all the contractor plaintiffs with respects to the injuries they were experiencing both at the time of the lawsuit filed and their intent at that moment, and then their future intent or the intent that happened after the lawsuit was filed initially in federal court. What our affidavits say from the contractor plaintiffs is that all of them were interested in applying or bidding for work on the 15th Street Bridge Project and the runway project at the moment the lawsuit was filed. Now, there was a PLA imposed on those projects at the time. They were interested in bidding on them. Now, after we filed their lawsuit, the PLAs were removed in response to our suit. Road Con went ahead and bid on both the 15th Street Bridge Project and the runway project without the PLA. Road Con was still interested, and as were other contractor plaintiffs, in bidding when the PLA was in effect, but Mr. Gottlieb's position is that in order for us to have standing, we have to go ahead and bid on a project that our contractor plaintiffs are categorically ineligible for or that we have to have an intent to bid on a project that we can't even be considered for because our clients belong to the wrong union or their employees belong to the wrong union. And with all respect, that is not a tenable view. You do not have to take a futile effort. This goes back to Judge McKee's point about the futility doctrine. You do not have to take an entirely futile effort in order to establish Article III injury in federal court. All you have to show is that you are able and ready to apply. You don't have to show that you actually are going to apply or you actually did apply in the past. The standard for prospective relief in challenging one of these policies is whether you stand able and ready to apply. That was the case in the city of Jacksonville. That was the standard. That was the standard in Kearney against Adams. It was also the standard in Grass against Bowling Alley. There's no requirement that you actually have to take a meaningless futile gesture by submitting a bid for a project that the city won't even consider you for. What about the city's argument that your clients did not in any event submit the lowest bid, would not have been awarded the contract? That doesn't defeat our standing, Judge McKee, because again, the city of Jacksonville is the relevant precedent here. All we have to show is that we are having a reduced opportunity to obtain work based on this policy that categorically excludes us from even being considered in the first place. So we don't have to prove that we would submit the low bid on these particular projects. We don't have to prove that we would submit the low bid on any future project. We just have to show that this policy categorically bars us from even competing with others for the city work. And that's enough to show injury in fact under the city of Jacksonville. That might be relevant to damages, the question that your honor asked. Yet again? Your honor's question I think would be relevant to damages. If we can't prove that we would have submitted a low bid, then maybe we can't prove damages. It's relevant at that stage, but not at the Article 3 injury stage. Just the lost opportunity to compete or a diminished opportunity to compete gets us past the injury in fact hurdle, even though it wouldn't prove necessarily a dollar amount of injury that would come later in the case. On equal protection, there was a lot of discussion about standing. Mr. Licata has standing because he is losing work opportunities on account of the PLA. Both the union security clause that requires him to be a member of a council affiliated union, and also the diversity and inclusion goals that limit the available construction hours for white men. Now, Mr. Gottlieb tries to pass this off as a mere suggestion rather than an ironclad requirement. Even if that's true, it's still an Article 3 injury because it is encouraging both unions and contractors to limit the amount of available hours for white men like Mr. Licata. Now, Mr. Gottlieb went on to say that Licata never actually proved that he wants to work on city projects as opposed to working on projects from other employers. That does not defeat his standing because he is still losing opportunities to work on city projects. He doesn't have to prove in court by a preponderance of the evidence that he wants to work on a city project rather than a different one. He just has to show that he is able and ready to apply, that he's interested in the work, because the reduced available pool of opportunities to a contractor or to an employee of a contractor imposes injury, in fact, under Article 3. All you need is an identifiable trifle to get to injury, in fact. You don't have to show that it's a large injury or that's a substantial injury. The size of the injury is irrelevant. You just have to show that some type of injury exists, no matter how small that might be. It can be a reduced opportunity to compete for the contractors, and for Mr. Licata, it can be reduced available opportunities on projects on which he might work. That shows injury, in fact, both for the First Amendment and for equal protection. I'm happy to answer any other questions. Could you respond to Mr. Kelly's argument when he cited those two sentences from the district court's opinion? And, Your Honor, could you remind me what those two sentences were? Yeah, they're the arguments about there was no evidence, so to speak, of the composition, of the racial composition of the union. Yeah, I don't think we need to prove any of that with respect to Article 3 injury or even the merits. We don't have to show that the racial makeup of a steelworkers-affiliated contractor is majority white. We don't have to show any of that. The contractor is injured because the city is telling the contractor or pressuring the contractor to alter the racial makeup or the demographic makeup of his workforce. That inflicts injury regardless of what the current composition is. If you look at the way the goals are phrased, and I can actually read one of them, it says that you have to make efforts. It says the unions, with respect to the unions, it says the union shall set goals that will significantly increase participation of minority males and women. That's a requirement that applies no matter what baseline you're starting from. That's the requirement imposed on the unions. And then for the contractors, the contractors shall use their best efforts to add minority males and women to their permanent or steady workforce. Again, no matter how many male minorities or how many women you already have in your workforce, you still have to make these efforts to add more of them. There's injury, in fact, because it's telling these contractors and the unions that you need to change the makeup of your workforce. And even if they're willing to do it, it's still injury because the city's trying to tell them what to do. So that gets us past, again, that identifiable trifle standard. Very low bar for us to meet under Article 3, but we can make it with respect to equal protection and also with respect to the First Amendment. Thank you very much. And I'm going to ask counsel to speak to the clerk about ordering a transcript of the argument, and maybe you'll split the cost of the transcript. Thank you very much for your arguments, your briefing. We'll circle back to you.